In re Lonnie Lee BOLEN, Debtor.

Lonnie Lee Bolen, Plaintiff,

v.

Mercedes Benz, Inc., Defendant.

No. C/A 01–13028–W.
Adversary No. 01–80333–W

United States Bankruptcy Court,
D. South Carolina.

June 21, 2002.

Lawrence Keitt, Orangeburg, SC, for debtor.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court upon the Adversary Complaint (the "Complaint") filed by Lonnie L. Bolen ("Debtor"). In the Complaint, Debtor alleges that Mercedes Benz, Inc. caused Debtor's 1997 Freightliner semi-truck (the "Truck") to be repossessed after Debtor filed for bankruptcy protection. Debtor named Mercedes Benz, Inc. as the Defendant in the caption of his Complaint; however, in the Joint Pre–Trial Order, the parties stipulate that DaimlerChrysler Services North America LLC, successor by merger to Mercedes–Benz Credit Corporation, ("Defendant") is the proper Defendant. Originally, Debtor sought both the return of the Truck as well as damages for Defendant's willful violation of the automatic stay pursuant to 11 U.S.C. § 362(h); however, after Debtor filed the Complaint, Defendant returned the Truck to Debtor.[1] Debtor, however, continues to assert his claim for damages stemming from the postpetition repossession and the period when Defendant retained the Truck, including damages for Debtor's lost wages totaling $14,000.00, the attorney's fees and costs Debtor incurred to bring the adversary proceeding, and punitive damages. In response, Defendant asserts that it did not receive a notice of Debtor's bankruptcy filing from either the Bankruptcy Noticing Center or correspondence from Debtor prior to the repossession. Defendant argues that the Notice of Chapter 13 Bankruptcy Case (the "Official Notice") from the Bankruptcy Noticing Center as well as correspondence from Debtor were mailed to Defendant's payment processing center, not to its customer service center, and that, had Debtor used the appropriate address, Defendant would have had notice of the bankruptcy and would not have repossessed the Truck. As an additional defense, Defendant justifies its retention of the Truck after learning of the bankruptcy filing because of its policy requiring debtors to inform Defendant that they seek the return of the collateral and to present it proof of insurance. Finally, Defendant disputes the amount of damages Debtor seeks. After considering the pleadings in the matter and the arguments made by counsel at the hearing, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, applicable in bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7052.[2]

## FINDINGS OF FACT

1. Debtor filed a Voluntary Petition for relief under Chapter 13 of the Bankruptcy Code on December 3, 2001.

2. When Debtor filed his petition, he had possession and ownership of the Truck. Debtor bought the Truck in December 2000 from Defendant, who loaned Debtor the funds to purchase the Truck and who received a security interest in the Truck. As an asset in which Debtor held an interest, the Truck was part of Debtor's bankruptcy estate.

3. In the mailing matrix supplied to the Court when he filed his Voluntary Petition, Debtor lists Defendant as a creditor at the following address: P.O. Box 2916, Milwaukee, Wisconsin 53202–2916. The Bankruptcy Noticing Center mailed the Official Notice to Defendant at the same Milwau-

---

1. Further references to the Bankruptcy Code shall be by section number only.

2. The Court notes that, to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and, to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

kee address but to the correct zip code of 53201–2916 on December 6, 2001.

4. On December 5, 2001, Debtor's attorney informed Debtor's creditors, including Defendant, of his bankruptcy filing by letter. The letter does not contain an addressee, and no addressed envelope was admitted into evidence. The letter was addressed to Defendant at either the Milwaukee address or one of its other addresses, Post Office Box 354, Lisle, Illinois 60532–1327; however, there is no physical proof where the letter was sent. An employee of Debtor's attorney, Bridgette Bennekin, testified that she mailed the letter to the Lisle address.

5. At approximately 2:30 a.m. on December 15, 2001, the Truck was repossessed on behalf of Defendant. Although Debtor informed the repossession agents of his pending bankruptcy case by showing them his bankruptcy papers, the agents resumed and completed the repossession.

6. Although Defendant did not concede that the repossessors were its agents, the Court finds that the repossessors were Defendant's agents. Defendant offered no evidence to refute the agency relationship, and the testimony clearly indicates that the repossessors appeared to work for Defendant. Moreover, the result of the repossession also indicates an agency relationship as, after the Truck was repossessed, it was placed in Defendant's control.

7. On December 19, 2001, Debtor filed his Notice, Chapter 13 Plan and Related Motions (the "Plan") with the Court. In the Plan, Debtor proposes to value and retain the Truck, and it was served on Defendant at the Milwaukee address.

8. Defendant admits that on December 19, 2001 its employee responsible for directing the repossession of the Truck,

David Howe, learned of Debtor's bankruptcy filing.

9. On December 21, 2001, Debtor filed the Complaint in this adversary proceeding, and, on December 28, 2001, Debtor's attorney served by mail a copy of the Summons, Notice, and Complaint to Defendant and its agent for acceptance of process at the Milwaukee address. Debtor's attorney received a return receipt, which indicated that C. Eichorn, an apparent agent or employee of Defendant, accepted the mailing on January 1, 2002.

10. On January 8, 2002, Defendant, through the law firm of Hale Headrick Dewey Wolf Golwen Thornton & Chance, PLLC, inquired with Debtor to determine whether he would consent to an order granting Defendant relief from the automatic stay as to the Truck. On January 10, 2002, Debtor's attorney responded by advising Defendant's counsel of the pending adversary proceeding and requesting the immediate turnover of the Truck.

11. On February 6, 2002, Debtor provided proof of insurance to Defendant.

12. Some time in February 2002, Defendant advised Debtor he could pick up the Truck from Defendant's agent in Wilmington, North Carolina. On February 16, 2002, Debtor and his spouse traveled to Wilmington to retrieve the Truck from a Freightliner dealership holding the Truck for Defendant; however, the dealership refused to release the Truck to Debtor. In undertaking this trip, Debtor incurred expenses for travel as well as loss of time from work or other endeavors. Defendant later returned the Truck to Debtor on February 22, 2002.

13. At the time the Truck was repossessed, Debtor performed over-road hauling for Carroll Fulmer, a company based in Groveland, Florida. His gross income averaged $1,800.00 per week before costs

for fuel, maintenance, insurance, and fees. Once the Truck was repossessed, Debtor was not available for dispatch to transport loads, and Carroll Fulmer canceled the parties' contract. Afterward, Debtor was unable find work for eight weeks until February 2002 when he worked for two weeks and grossed a total of $1,500.00. Once the Truck was returned to him, Debtor began and continues to haul concrete materials on a flatbed trailer; however, he earns approximately $500.00 to $1,000.00 less per week than he earned as an over-road hauler under the contract existing at the time of repossession.

14. Debtor's costs associated with maintaining the Truck fluctuate. Although he pays certain costs like license fees and tags once per year, other expenses like fuel and maintenance costs vary depending on his use of the Truck. During the period when Debtor did not have access to the Truck, he did not pay maintenance expenses for its upkeep; however, he maintained insurance on the Truck at monthly payments of approximately $200.00. Further, he had already paid certain registration fees mid-year 2001.

## CONCLUSIONS OF LAW

### I. Was the postpetition repossession of the Truck a willful violation of the automatic stay pursuant to § 362(h)?

The parties stipulate that the repossession of the Truck was postpetition and violated the automatic stay. In fact, Defendant admits that damages are appropriate. The issues are whether Defendant willfully violated the automatic stay with its repossession and continued retention after learning of Debtor's bankruptcy case and, if so, what are the damages Debtor suffered as a result.

■ The Fourth Circuit defined a willful violation of the automatic stay as occurring when a creditor knows of the pending bankruptcy petition and intentionally attempts to continue collection procedures in spite of it. *See Budget Serv. Co. v. Better Homes of Virginia, Inc.,* 804 F.2d 289, 293 (4th Cir.1986) (upholding a finding of a willful violation of the automatic stay where the creditor was served with written notice of the bankruptcy filing yet the creditor repossessed one vehicle postpetition and attempted to repossess two others postpetition). The moving party bears the burden of proof in an action for violation of the automatic stay and must prove the violation by clear and convincing evidence. *See Brockington v. Citizens & S. Nat'l Bank of South Carolina (In re Brockington),* 129 B.R. 68, 70 (Bankr.D.S.C.1991); *see also Diviney v. NationsBank of Texas (In re Diviney),* 211 B.R. 951, 961 (Bankr. N.D.Okla.1997), *aff'd* 225 B.R. 762 (10th Cir. BAP 1998).

■ Regarding the element of knowledge of the pending bankruptcy, Defendant argues that it did not have notice of the bankruptcy case when it repossessed the Truck. Debtor disputes this assertion, claiming his attorney mailed notice of Debtor's bankruptcy case to Defendant on December 5, 2002. Defendant does not deny that the Bankruptcy Noticing Center mailed it a notice on December 6, 2001 to the Milwaukee address or that Debtor mailed it materials relating to his bankruptcy filing on December 5, 2001; however, Defendant argues the service was ineffective because Debtor used the incorrect zip code and because the Milwaukee address where the materials were sent is for payment processing only. According to Defendant, if Debtor had notified it of his bankruptcy at the customer service address in Lisle, Illinois, Defendant would

have known of the case and not repossessed the Truck.

Although there is confusion regarding where Debtor's attorney office mailed the notice of the bankruptcy on December 5, 2001, this issue is not pivotal. Regardless of where the correspondence was addressed on December 5, 2001, the fact remains that Debtor informed Defendant's repossession agents at the time they sought repossession of the Truck that he had filed bankruptcy. Indeed, Debtor showed these agents a packet of bankruptcy materials that included his case number, petition date, petition, and schedules, and these materials verified that he had filed his bankruptcy case.[3] When this notice was received, the agents should have stopped their repossession efforts and inquired further as to Debtor's pending bankruptcy case. *See Brockington,* 129 B.R. at 71 (finding a willful violation of the automatic stay when, at the time of repossession, the creditor had not yet received notice of the bankruptcy case but the debtors informed the creditor's repossessing agent of their filing). Moreover, Defendant acknowledged that the employee responsible for repossession and collection efforts learned of Debtor's bankruptcy on December 19, 2001. This admission indicates that, during most of the period when Defendant retained the Truck, it knew of the bankruptcy. *See, e.g. Skinner v. Cumberland Auto Ctr. (In re Skinner),* 238 B.R. 120, 124 (Bankr.M.D.Tenn.1999) (ruling that the element of knowledge in the context of a willful violation of the automatic stay was satisfied where the creditor admitted knowledge of the debtor's Chapter 13 case before repossessing the debtor's vehicle and deliberately ignoring the stay). Defendant did not explain how it received notice of the case; however, it is inferable that the Official Notice from the Bankruptcy Noticing Center or correspondence from Debtor was received by Defendant prior to December 19, 2001 and clearly arrived in the appropriate department of Defendant at least by that date. This inference is further bolstered by the fact that Defendant timely answered Debtor's Complaint, which was also mailed to the Milwaukee address. Although Defendant disputes its ability to receive bankruptcy notices at the payment processing address, its actions later in the case suggest that this address was effective for service.[4]

The Court now shifts its focus to determine whether Defendant intentionally continued its collection attempts with notice of

---

3. At the hearing, the Court took under advisement the issue of whether an acknowledgment by the repossession agents that they reviewed Debtor's Chapter 13 bankruptcy materials before repossessing the Truck should be admitted into evidence. Defendant argued that this acknowledgment was not included as an exhibit in the Joint Pre–Trial Order, and Debtor argued that Defendant had adequate notice of the document as Debtor testified to it in his deposition. The Court admits the document into evidence (identified as Debtor's Exhibit C) on the ground that it is cumulative and supports the testimony that the repossessors were Defendant's agents and were advised at the time of repossession of Debtor's prior bankruptcy filing.

4. Defendant's representative, David Howe, admitted on cross-examination that Defendant has a responsibility to communicate among its different departments and that it failed to do so in this instance. Indeed, it is undisputed that Debtor provided written notice of the bankruptcy filing to Defendant, and this case contrasts *In re Belcher* where the debtor failed to notify creditors of her bankruptcy filing until nearly a month after filing her petition. *See* 189 B.R. 16, 17 (Bankr. S.D.Fla.1995). Unlike the *Belcher* case, where the court described the creditor's repossession of collateral as a "self-inflicted wound" that the debtor likely could have avoided by providing her creditors with notice, Debtor contacted Defendant and informed it of his bankruptcy case.

the bankruptcy case. The Court concludes that Defendant did exactly this. Despite knowledge of Debtor's bankruptcy, Defendant retained the Truck from December 15, 2001 until February 22, 2002. The continued retention of collateral that was admittedly wrongly repossessed postpetition constitutes a willful violation of the automatic stay when the creditor has notice of the pending bankruptcy case. *See McCarthy v. Imported Cars of Maryland, Inc. (In re Johnson),* 230 B.R. 466, 470–71 (Bankr.D.D.C.1999) (ruling that a creditor who retained a vehicle wrongly repossessed postpetition and who had notice from the Chapter 7 trustee of the bankruptcy case willfully violated the automatic stay); *LaTempa v. Long (In re LaTempa),* 58 B.R. 538, 542 (Bankr.W.D.Va.1986) (finding a willful violation of the automatic stay where the creditor who knew of the debtors' bankruptcy filing retained possession of a vehicle that it repossessed postpetition for three days before returning it to the debtors); *Mullis v. USA Rest. Equip. Co. (In re Harsh),* 277 B.R. 833, 836–38 (Bankr.M.D.Ga.2001) (finding that continued control over collateral wrongly repossessed postpetition with knowledge of the bankruptcy case constituted a knowing and willful violation of the automatic stay); *Ard v. Auto. Acceptance (In re Ard),* C/A No. 95–70839–D, Adv. Pro. No. 95–8051–D, slip op. at 2 (Bankr.D.S.C. Mar. 5, 1996) (holding that a creditor who wrongly repossessed a vehicle postpetition willfully violated the automatic stay when he retained the vehicle despite notice of the bankruptcy case).

Relying on its policy that requires debtors to provide proof of insurance and to demand the return of the collateral before it returns trucks, Defendant justifies its retention of the Truck. As support for its position, Defendant cites *Jennings v. R & R Cars and Trucks (In re Jennings),* 2001 WL 1806980 (Bankr.D.S.C.). *Jennings* ex-amines the appropriate procedure debtors should follow when, pursuant to § 542, they seek the turnover of collateral in which they own an interest that a creditor rightfully repossessed prepetition. In *Jennings,* the debtors filed a joint petition for relief under Chapter 13 four days after a creditor repossessed their vehicle, and, subsequently, they filed an adversary complaint seeking the turnover of the vehicle. After examining the issue of turnover, the Court concluded that when a creditor holds collateral that was properly repossessed prepetition, a debtor is entitled to the return of the collateral upon satisfying the following three steps: (1) notifying the creditor in writing of the bankruptcy case, (2) demanding in writing the turnover of the collateral, and (3) providing proof of insurance protecting the creditor's interest in the collateral. *See id.* at *6.

The case currently before the Court, however, differs from *Jennings.* As noted previously, *Jennings* involved a *prepetition* repossession that took place before any automatic stay was in effect. In contrast, this proceeding involves a situation where Debtor filed bankruptcy, the automatic stay was in effect, and Defendant repossessed collateral postpetition. By repossessing the Truck postpetition and before the automatic stay was lifted, Defendant acted improperly and violated the automatic stay. To retain the Truck and demand proof of insurance or other means of adequate protection before returning it to Debtor is a continuing and deliberate violation of the stay and increased the damages of Debtor. Further, to allow Defendant to continue its wrongful possession of the Truck blurs the lines between two distinct, albeit closely related, issues, turnover and the automatic stay. Indeed, a creditor may have a defense to a turnover action, such as a demand for insurance or other adequate protection, but this defense

may not apply to an action for violation of the stay for property wrongfully repossessed postpetition. For example, in *Skinner*, the creditor, an automobile dealer, repossessed a vehicle from the debtor postpetition despite knowing of the bankruptcy case. *See* 238 B.R. at 120. The creditor took this action without seeking or obtaining relief from the automatic stay. The debtor filed a complaint alleging a willful violation of the automatic stay and seeking the turnover of the vehicle. The court ruled that the creditor willfully violated the automatic stay; however, it also ruled that turnover was inappropriate. *See id.* at 126. The court reasoned that the debtor's interest in the vehicle was only a purchase order for the vehicle that was contingent upon the debtor's obtaining financing and that this interest was too tenuous to justify the turnover of the vehicle. As *Skinner* illustrates, a creditor could decide its turnover position is so strong and convincing that it retains the collateral, yet it does so at the risk of exposing itself to increased damages for a willful violation of the automatic stay.

In concluding that Defendant's retention of the collateral willfully violated the automatic stay, the Court notes that Defendant could have inquired with the Court to determine whether its actions were appropriate. *See Brown v. Town & Country Sales & Serv. Inc. (In re Brown)*, 237 B.R. 316, 321 fn. 7 (Bankr.E.D.Va.1999) ("The automatic stay is the most fundamental protection afforded a debtor when bankruptcy is filed. Where there is uncertainty as to whether the creditors' actions will violate the automatic stay or not, the creditor should seek court permission and relief from stay. The creditor undertakes the risk of sanctions pursuant to section 362 when it attempts to interpret the application of the automatic stay and the scope of property to which it applies.") (citations omitted). Indeed, once it learned of the bankruptcy filing and its postpetition violation, Defendant had the duty to contact Debtor or his counsel and move quickly to restore matters to the status quo. *See Belcher*, 189 B.R. at 18.

## II. What is the amount of damages Debtor suffered as a result of Defendant's willful violation of the automatic stay?

 The Court believes that damages are warranted in this case. Debtor was without the Truck, his sole means of supporting his family, for nearly ten weeks, and he was unable to find work for eight of those weeks. Pursuant to § 362(h), the Court shall award a party who is injured by a willful violation of the automatic stay actual damages, including costs and attorney's fees, and, in appropriate circumstances, punitive damages.

As actual damages, Debtor seeks the gross income he anticipates he would have earned had he continued working for Carroll Fulmer, the over-road hauling company; however, the Court concludes that the more accurate measure of damages Debtor suffered is represented by the net income he would have earned during that period. The Court reaches this conclusion based upon the many variables that factor into the Truck's upkeep and maintenance. Debtor admitted that he did not pay for some of these expenses while Defendant possessed the Truck; therefore, the Court will not award him damages for expenses that he did not incur. However, the Court recognizes that some expenses like Debtor's licensing fees and taxes were paid mid-year 2001 and that, although Debtor paid these as a condition of operating his Truck during a certain period, he was unable to use his Truck because of Defendant's retention of it. Because there is a great overlap in expenses that were incurred with others that were not, the

Court concludes it should rely on Debtor's net income. The Court has reviewed Debtor's weekly Operator Settlements from Carroll Fulmer, and these statements indicate Debtor's gross and net pay. From March 21, 2001 when he began working for Carroll Fulmer through December 18, 2001, Debtor's average net weekly pay was approximately $700.00.[5] The Court multiplies this amount by the eight weeks [6] when Debtor could not find work and concludes that Debtor is entitled to damages for his lost wages in the amount of $5,600.00.[7]

The Court also finds that Debtor incurred expenses and damages traveling to Wilmington, North Carolina on February 16, 2002 in an unsuccessful attempt to retrieve the Truck in the amount of $250.00.

The Court also finds that Debtor incurred attorney's fees and costs associated with the prosecution of this adversary proceeding. The Court finds that Debtor is entitled to damages for reasonable attorney's fees he incurred in the amount of $5,000.00.[8]

▆▆▆▆ Finally, the Court concludes that punitive damages are warranted in this case. The Court notes that, in recent decisions, several courts severely punished creditors who demonstrate their disdain of the automatic stay by retaining property that was repossessed improperly. *See Diviney v. NationsBank of Texas (In re Diviney)*, 225 B.R. 762, 778 (10th Cir. BAP 1998) (affirming a punitive damages award of $40,000.00 for the creditor's postpetition repossession, retention, and sale of the debtors' vehicle despite notice that the debtors' case was reinstated and active); *Progressive Motors, Inc. v. Frazier*, 220 B.R. 476, 479 (D.Utah 1998) (affirming a punitive damages award of $20,000.00 that increased to $30,000.00 in ten days if the damages award were not paid where the creditor repossessed a vehicle postpetition without obtaining relief from the automatic stay and subsequently sold it at auction); *In re Meeks*, 260 B.R. 46, 48 (Bankr. M.D.Fla.2000) (finding that a debtor was entitled to punitive damages of $35,000.00 and canceled the debtor's indebtedness on the repossessed vehicle for the creditor's improper postpetition repossession of the vehicle after receiving actual notice of the debtor's filing bankruptcy on at least three occasions). Closer to home, this Court decided to award a minimal amount of

5. The Court relied on statements from March 21, 2001 through July 18, 2001 and statements from September 5, 2001 through December 18, 2001. Debtor testified that he continued to work for Carroll Fulmer during July and August 2001 but that he inadvertently failed to include these statements in Debtor's Exhibit D. Accordingly, the Court determined Debtor's average net pay from the only evidence before it, the thirty-four statements that were admitted into evidence, and did not take into account the six weeks where no statement substantiates Debtor's earnings.

6. Although Defendant retained the Truck for nearly ten weeks, the Court will consider only eight weeks for determining Debtor's lost wages because Debtor found other employment for two weeks of the period.

7. The Court notes the difference between the amount of lost wages damages ($5,600.00) and the amount sought at the hearing ($14,000.00) and explains that one reason for this difference is because neither the Carroll Fulmer employment contract nor his current contract (or the terms of his regular employment) was introduced into evidence. Consequently, the Court is unable to compare the two contracts and determine Debtor's diminished future income attributable to the "lost" contract.

8. Debtor's counsel represented to the Court that he devoted thirty hours to this adversary proceeding and that his rate is $200.00 per hour; however, he seeks a minimum of $5,000.00 in fees.

punitive damages where a creditor mitigated its damages by promptly returning the repossessed vehicle after learning of the debtor's bankruptcy. *See Brockington,* 129 B.R. at 71 (finding that punitive damages of $500.00 were warranted for the willful violation of the automatic stay but noting that these damages were mitigated because the creditor voluntarily returned the vehicle to the debtor the day after it was repossessed). The Court concludes this case contrasts *Brockington* as, instead of returning the repossessed collateral one day after learning of the debtor's bankruptcy case (the creditor's action in *Brockington*), Defendant retained the vehicle for ten weeks before returning it. Moreover, the retention caused the loss of employment to Debtor, and, although Defendant soon learned of Debtor's bankruptcy, it took no steps to contact Debtor or his counsel to attempt to return the Truck to Debtor. As noted previously, a creditor who blatantly violates the automatic stay may not do nothing without running the risk of being assessed punitive damages for a willful violation; it must actively attempt to return matters to the status quo.

Because of the egregious facts of this case, including the early morning repossession with notice of the bankruptcy filing, the length of time Defendant retained the property, Debtor's traveling to North Carolina to retrieve the Truck at Defendant's directions (unsuccessfully), and Debtor's actual damages and his loss of the Carroll Fulmer employment contract that he valued, the Court rules that Debtor is entitled to punitive damages of $12,500.00. This amount of punitive damages is intended to deter Defendant and other creditors from such actions. The automatic stay is one of the most essential and basic rights a debtor has when filing bankruptcy. To ignore it as blatantly as Defendant did in this case merits a serious punitive damages award that will get Defendant's attention, encourage it to change its policy, and deter it from engaging in further erroneous conduct.

**IT IS THEREFORE ORDERED** that Debtor is entitled to actual damages for lost wages ($5,600.00), expenses incurred in traveling to North Carolina to obtain the truck ($250.00), and attorney's fees and costs ($5,000.00) as well as punitive damages ($12,500.00) for Defendant's willful violation of the automatic stay. A judgment is therefore entered in the amount of $23,350.00 against DaimlerChrysler Services North America LLC, successor by merger to Mercedes–Benz Credit Corporation.

**AND IT IS SO ORDERED.**