**In re Franklin Roosevelt JOYNER, Debtor.**

**Robert F. Anderson, Trustee, and Franklin Roosevelt Joyner, Debtor, Plaintiffs,**

v.

**Dick Smith Nissan, Inc., Defendant.**

**Bankruptcy No. 02–12840–W.
Adversary No. 03–80158–W.**

United States Bankruptcy Court,
D. South Carolina.

Jan. 5, 2004.

---

Jane H. Downey, Columbia, SC, for Debtor.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

This matter comes before the Court on the Adversary Complaint (the "Complaint") of Robert F. Anderson (the "Trustee"), and Franklin Roosevelt Joyner (the "Debtor"), against Dick Smith Nissan, Inc. ("Nissan"). The Complaint seeks damages for violation of the automatic stay pursuant to 11 U.S.C. § 362,[1] turnover of the value of a 1997 BMW Z3 Roadster pursuant to § 542, and for avoidance of lien by the Trustee pursuant to § 544(a). After considering the pleadings in the matter and the arguments made by counsel at the hearing, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, applicable in bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7052.[2]

## FINDINGS OF FACT

1. In early June 2002, Debtor received a letter from Capital One Auto Finance indicating that he had been approved for a loan to purchase a new or used vehicle. The letter suggested that Debtor visit one of four dealerships identified by Capital One to take advantage of this offer. The letter included certain restrictions set forth in fine print at the bottom of the page.

2. On June 27, 2002, Debtor brought the Capital One letter to Nissan's place of business, met with Nissan's salesman and selected a 1997 BMW Z3 Roadster (the "Vehicle") as the vehicle he wished to purchase. Four documents (collectively, the "Agreements") were then executed by the parties regarding the transaction.

3. On June 27, 2002, Debtor and Nissan executed a "Buyer's Order" prepared by Nissan which provided for a total purchase price of $19,975. The Buyer's Order provided, in relevant part, that the contract was not binding upon Nissan until a retail installment contract for any deferred balance had been approved. Also, in small print on an additional page, the Buyer's Order included the following language:

SPOT DELIVERY. Unless indicated otherwise in writing, Dealer hereby conditionally delivers the vehicle to Customer [Debtor] subject to approval and funding of a retail installment contract by a third-party financing source. Title shall remain in the Dealer until funded.

4. Also on June 27, 2002, Debtor and Nissan executed an Installment Sale Contract and Security Agreement (Installment Sale Contract # 1) prepared by Nissan which provided for a purchase price of $24,975. Debtor agreed to trade in his 1997 Ford automobile. The amount financed was $22,733 that Debtor agreed to repay over 54 months with interest at 13.95%. The Installment Sale Contract provides that the sale was contingent upon financing and that buyer (Debtor) granted seller (Nissan) a security interest in the form of a recorded first lien on the title to

---

1. Further references to the Bankruptcy Code will be by section number only.

2. The Court notes that, to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and, to the extent any Conclusion of Law constitute Findings of Fact, they are so adopted.

the property, or in accordance with the Uniform Commercial Code.

5. After the Buyer's Order and Installment Sale Contract #1 were executed, Debtor left his Ford automobile with Nissan and took possession of the BMW. Debtor testified that his understanding was that as a result of this transaction he owned the BMW.

6. Testimony by the finance manager of Nissan, Bill McCartney, indicated that upon examination of the documents then executed, he realized that Capital One would not approve the financing. McCartney testified that he then submitted the installment contract to WFS Financial for approval. WFS declined to provide financing for Debtor, so Nissan prepared and the parties executed a second Installment Sale Contract and Security Agreement on June 29, 2002, which did not include the trade.[3] (Installment Sale Contract #2). The cash price was reduced to $19,500 and the trade of the Ford automobile was cancelled and it was returned to Debtor.

7. Also on June 29, 2002, Debtor signed a third Installment Sale Contract and Security Agreement that was not signed by Nissan (Installment Sale Contract #3). Installment Sale Contract #3 provided for a cash price of $19,895 and a cash down payment by Nissan of $1000.

8. Finally on June 29, 2002, the parties executed an agreement regarding the terms for Debtor's possession of the Vehicle (the "Agreement"). The Agreement provides as follows, in relevant part:

1. Buyer may take possession and use said vehicle pending approval of his/her application of credit.

3. Seller hereby retains a security interest in said vehicle and, upon receipt of the rejection or disapproval of buyers said application for credit, shall have the right to take immediate possession of said vehicle same may be found. [sic]

9. Some time prior to August 12, 2002, Nissan submitted an Application for a Title on the Vehicle to the South Carolina Department of Public Safety that listed Capital One Auto Finance as the lienholder and Debtor as the owner.[4] As a result, a certificate of title was issued and the Vehicle was registered in Debtor's name.[5] The Debtor was responsible for insurance and taxes, and the tags and registration for the Vehicle were delivered to Debtor by Nissan.

10. Debtor testified that in August 2002 he contacted Capital One to inquire about a payment book, and learned that Capital One had rejected the financing. Nissan attempted to find alternative financing for several months without success. Debtor further testified that Nissan

---

**3.** McCartney testified that various installment contracts were executed containing different financing terms. The installment contracts list varying sales prices for the BMW. McCartney testified that the price on the initial contract varied from the Buyer's Order price to avoid showing the negative equity on the trade-in vehicle in hopes of obtaining third-party financing.

**4.** It is unclear the exact date the Application for Certificate of Title was submitted. The Application references a June 27, 2002 acquisition and transaction date. In any event, the

registration for the Vehicle is dated August 12, 2002 and references a title number. Accordingly, it appears the Application was submitted and a title was issued prior August 12, 2002.

**5.** Although only the application for certificate of title indicating that Debtor was owner of the Vehicle rather than a copy of the actual certificate of title was submitted by the parties, it appears undisputed that a certificate of title was issued with information as reflected by the application.

did not notify him that all financing had fallen through.

11. Following informal efforts made to recover the Vehicle from Debtor, Nissan retained an attorney, Gregory Studemeyer. Studemeyer forwarded a letter of representation to Debtor dated October 23, 2002 indicating that Debtor owed Nissan $19,224. The letter does not request the return of the vehicle or assert that Nissan has an ownership interest. Debtor testified that he did not receive the demand letter.

12. Debtor filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code on October 28, 2002. Debtor's Schedule B indicated that he owned the 1997 BMW Z3 Roadster automobile. Debtor also listed a potential claim against Nissan on Schedule B and claimed the Vehicle as exempt in the amount of $1,200.00 on Schedule C pursuant to S.C.Code § 15–41–30(2). Nissan was listed as an unsecured creditor of Debtor in the amount of $26,964 on Debtor's liability schedules with an address of 3670 Fernandina Road, Columbia, SC 29210. The record indicates that notice of the bankruptcy filing was mailed to Nissan on November 1, 2002. Nissan does not deny that it received the notice.

13. Shortly after Debtor filed his Petition for Relief, on October 29, 2002, Studemeyer filed a complaint in the South Carolina Court of Common Pleas for Richland County on behalf of Nissan against Debtor for the recovery of the Vehicle. The complaint requested immediate possession of the Vehicle without prior notice to Debtor. On October 29, 2002 an Order for immediate possession was issued. Nissan repossessed the Vehicle postpetition on November 5, 2002.

14. On December 10, 2002, counsel for the Trustee contacted Studemeyer by telephone to advise of his representation of the Trustee and his demand for the BMW as property of Debtor's estate. On December 11, 2002, counsel for the Trustee wrote a letter to Studemeyer concerning the estate's interest in the Vehicle. Studemeyer responded in a letter dated December 12, 2002, disagreeing with the Trustee's contention that ownership of the Vehicle had ever been transferred from Nissan to Debtor. The Trustee replied on December 26, 2002, again noting his position that Nissan had violated the automatic stay in repossessing the Vehicle and that continuing to withhold property of the estate is a willful violation of the automatic stay pursuant to § 362. Shortly thereafter, and without further notice to the Trustee, Nissan sold the Vehicle to another party for $17,975.

15. In the Complaint, Debtor and the Trustee allege that Nissan caused Debtor's Vehicle to be repossessed after the Debtor filed for bankruptcy protection. Debtor and the Trustee maintain that Nissan willfully violated the automatic stay and request that it be held in contempt and ordered to pay actual and punitive damages with attorneys' fees. Debtor and the Trustee also request the turnover of the value of the Vehicle pursuant to 11 U.S.C § 542. Finally, the Trustee alleges that Nissan should be declared to be an unsecured creditor due to its failure to properly perfect its security interest in the Vehicle under S.C.Code § 56–19–630. Debtor further contends that repossession of the Vehicle caused significant hardships, including embarrassment and humiliation. In order to purchase a replacement vehicle, which Debtor contends was less desirable than the Vehicle, Debtor was required to pay a higher interest rate and tender a $1,200.00 down-payment. Debtor further seeks lost wages in the amount of $288.

16. In response, Nissan asserts that it was the owner of the Vehicle, not Debtor,

and that the Trustee does not have standing to pursue damages for violation of the automatic stay under 11 U.S.C. § 362(h).

### CONCLUSIONS OF LAW

The primary question for this Court to decide is to what extent Debtor's estate had an interest in the Vehicle at the time it was repossessed by Nissan. Once a determination is made regarding the extent of the Debtor's estate's and Nissan's interest in the Vehicle and whether the Trustee can avoid any lien of Nissan pursuant to § 544, the Court will then address whether turnover pursuant to § 542 is warranted. Finally, the Court will address the standing of the Trustee to recover damages for a violation of § 362, as well as whether and to what extent a violation of § 362 occurred and any resulting damages.

### I. Property of the Estate

■ In order to determine a debtor's interest in property, bankruptcy courts examine state law. *In re Shearin*, 224 F.3d 346, 349 (4th Cir.2000) (citing *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). *See also In re Blackwell*, No. 98–2748, 1998 WL 2017334, at *3 (Bankr.D.S.C. Sept. 2, 1998). Pursuant to South Carolina law,[6] the intention of the parties to a contract is of primary importance. *Southern Atlantic Fin'l Servs. v. Middleton*, 349 S.C. 77, 80, 562 S.E.2d 482, 484 (S.C.Ct.App.2002). This Court has previously noted that when examining the intent of the parties in the case of an agreement regarding ownership of a vehicle, particular attention is given to "whose name the collateral is titled and their ability to exercise ownership rights." *In re Smith*, 259 B.R. 561, 567 (Bankr. D.S.C.2000) (examining factors to be considered in determining whether vehicle

agreement is a lease or one for security). In the matter before the Court, as a result of Nissan's actions, the application for certificate of title, the Vehicle registration, Vehicle insurance, and the Richland County tax notice all show Debtor as owner of the Vehicle. These documents provide indicia of ownership by Debtor for which Nissan did not sufficiently rebut. *See* S.C. CODE ANN. § 56–19–320 (Law.Co-op.1991) ("A certificate of title issued by the Department is prima facie evidence of the facts appearing on it.").

Despite the indicia of ownership by Debtor, Nissan contends that it retained title to the Vehicle rather than a mere security interest and thus was the owner of the Vehicle at the time of repossession. A security interest is defined in the South Carolina Commercial Code as follows, in relevant part:

> "[A]n interest in personal property or fixtures which secures payment or performance of an obligation. *The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 36–2–401) is limited in effect to a reservation of a 'security interest.' "*

S.C. CODE ANN. § 36–1–201(37) (Law.Co-op.2003) (emphasis added). Further, Section 36–2–401 provides, in relevant part, that:

> Each provision of this chapter with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this chapter and matters concerning title become material the following rules apply:

**6.** The parties entered into the contract in South Carolina, and there appears to be no dispute that South Carolina is the applicable state law.

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (§ 36–2–501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this act. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the chapter on secured transactions (Title 36, Chapter 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed to by the parties.

S.C. CODE ANN. § 36–2–401 (Law.Co-op.2003).

The Bankruptcy Court for the District of Columbia construed an analogous Maryland statute under a similar set of facts in *McCarthy v. Imported Cars of Maryland, Inc. (In re Johnson)*, 230 B.R. 466 (Bankr. D.D.C.1999). In *Johnson,* an automobile dealer "spot delivered" an automobile to a purchaser who executed an Installment Contract, Spot Delivery/Financing, and a Buyer's Order. The terms of the spot delivery were that buyer took possession of the car pending approval by a financing source. The purchaser filed a Voluntary Chapter 7 Petition prior to obtaining third party financing for the purchase of the car. No Certificate of Title was issued on the vehicle. After the Petition was filed, the automobile dealer repossessed the automobile. The dealer contended that it retained title by virtue of the spot delivery terms. The Chapter 7 Trustee brought an action against the dealer for violation of the automatic stay. The Bankruptcy Court relied on MD. CODE ANN., COMMERCIAL LAW § 2–401(1) and held that:

Even if College Park [the automobile dealer] had retained or reserved title, it would still only have a security interest. The passage of title cannot occur before goods are identified to the contract, nor can the passage of title be delayed until after shipment or delivery of the goods to the buyer. After shipment or delivery, any retention of title by the seller results only in the reservation of a security interest. In between these extremes, the parties may freely specify the time at which title passes. [Citations omitted.]

*Id.* at 468. S.C. CODE § 36–2–401 is identical to the Maryland statute relied upon in *Johnson.* Further, Maryland has similar provisions concerning vehicle transfers pursuant to the motor vehicle statutes. *Compare* MD. CODE ANN., TRANSP. § 13–107(c) (WESTLAW through 2003 Sess.) *with* S.C. CODE § 56–19–320 (Law.Co-op.1991). *Compare* MD. CODE ANN., TRANSP. § 13–112 (WESTLAW through 2003 Sess.) *with* S.C. CODE ANN. § 56–19–360 (Law.Co-op.1991). Finally, the court in *Johnson* recognized the ability in that case of the dealer to rescind its agreement but found it was not done. The Court finds the reasoning of *Johnson* persuasive.

In the matter before the Court, even if Nissan had an ability to rescind its transaction with Debtor based on the facts of this case, the Court is not convinced that the transaction between Nissan and Debtor was rescinded prior to Debtor's bankruptcy filing. Debtor filed bankruptcy on October 28, 2002. While there was evidence that prior to that date Nissan sent a letter to Debtor demanding payment, the letter does not seek return of the Vehicle but refers to Nissan as a creditor seeking collection of a debt. As such, the demand letter further reaffirms the intent of the parties concerning the sale of the Vehicle. Finally, Nissan did not file a claim and delivery action until October 29, 2002, one day following Debtor's filing.

Nissan's argument that the language in the Agreements reflects that it retains title rather than a security interest is further weakened by a South Carolina Supreme Court opinion concerning an attempt to reserve title. In *Brockbank v. Best Capital Corp.*, a mobile home dealership argued that it retained title to a mobile home rather than the buyer. 341 S.C. 372, 534 S.E.2d 688 (S.C.2000). The dealer contended that Article 9 did not apply to an agreement it had with buyer to purchase a mobile home, thus the dealer could sell the mobile home without notice to the buyer upon payment default. The agreement provided, in part, that the dealer retained title until buyer successfully completed all payments to the dealer.

The court in *Brockbank* found that because the agreement provided for retention of title until the completion of all payments, it was in the nature of a conditional sales contract and was actually a security device. *Id.* at 380–81, 534 S.E.2d at 692–93 (citing *Black's Law Dictionary* in that reservation of title by seller until payment is made is considered a conditional sale contract). *See also* S.C.Code Ann. § 36–2–401 Reporter's Comments ("Any attempt to reserve title in the seller after delivery to the buyer, however, is ineffective under subsection (1). The typical situation is the conditional sales contract which expressly provides for title to remain in the seller until payment of the purchase price."). The court in *Brockbank* specifically cited S.C.Code § 36–2–401(1), noting that retention or reservation of title

by a seller notwithstanding delivery of goods is limited in effect to a reservation of a security interest. *Id.*, S.C. Code Ann. § 36–2–401 (Law.Co-op.2003).[7] A security interest is further defined under Title 56 as:

> [a]n interest in a vehicle reserved or created by agreement which secured payment or performance of an obligation, conditional sale contract, conditional lease . . . .

S.C. Code Ann. § 56–19–10(29) (West Supp.2002).[8] Inasmuch as the Agreements can be considered conditional sales contracts to the extent there is a reservation of title by Nissan pending payment, the transaction between Nissan and Debtor seems to more accurately described as retention of a security interest by Nissan.

▪ The Court further notes that South Carolina law provides that ambiguous documents should be interpreted against the drafter. *Southern Atlantic Fin'l Servs., Inc. v. Middleton*, 349 S.C. 77, 84, 562 S.E.2d 482, 486 ("It is well settled that ambiguities arising within a contract must be construed against the drafter."). The Agreements are ambiguous at best. In order to consummate this one transaction, five agreements were drafted and four actually executed by the parties (two installment sale contracts, the Buyer's Order and the Agreement). The Buyer's Order states that Nissan is to retain title and makes no reference to the granting of a security interest. The Agreement states that Nissan maintains a security interest

---

**7.** The Court further recognized that a mobile home is considered personal property and that a security interest in a mobile home is perfected by listing the interest on the certificate of title, citing the same provisions applicable to perfecting an interest in a motor vehicle pursuant to Title 56, Motor Vehicles.

**8.** It is important to note that the court stated that Title 56, the certificate of title statutes,

"only govern the issue of whether or not the security interest in the collateral in question has been duly perfected. All other aspects of such transactions are governed by the Article 9 rules." *Brockbank*, 341 S.C. at 379, 534 S.E.2d at 692. Accordingly, the Commercial Code appears applicable to the transaction between Nissan and Debtor.

in the Vehicle, but does not mention title. Installment Sale Contracts #1 and #2 are identical in form and indicate that a security interest is to be granted, but the fine print on the second page of the Contracts references retention of title until payment is made in full. It is not for the Court to attempt to reconcile the many different terms and conditions in these four Agreements. Rather, the Court is to read the contracts together as one instrument. *Moshtaghi v. The Citadel*, 314 S.C. 316, 321, 443 S.E.2d 915, 918 (S.C.Ct.App. 1994). Further, Debtor testified that his understanding was that he owned the car, even though he also understood that financing needed to be obtained. Testimony on behalf of Nissan was that they routinely "spot deliver" vehicles and intend to retain title until financing is approved in order to ensure that they are able to "take the buyer off the market." As such, it appears the intention of the parties was to sell the Vehicle. *Southern Atlantic*, 349 S.C. at 80–81, 84 562 S.E.2d at 484–86 (ambiguities construed against drafter; extrinsic evidence can be considered).

For all the reasons set forth above, it appears that based on the facts of this case, Nissan's interest in the Vehicle was in the nature of a security interest. Accordingly, the Vehicle was property of the estate at the time of repossession. *See* 11 U.S.C. § 541(a)(1) (property of the estate includes all legal or equitable interests of the debtor in property as of the commencement of the case). *See also* S.C. CODE ANN. § 56–19–10(21) (West Supp. 2002) ("Owner" of a motor vehicle is defined as "[a] person, other than a lienholder, having the property in or title to a vehicle. The term includes a person entitled to the use and possession of a vehicle

subject to a security interest in another person but excludes a lessee under a lease not intended as security.").

## II. Perfection of Security Interest and Lien Avoidance

■ The Trustee alleges that Nissan's security interest is invalid against the Trustee pursuant to § 544 and S.C.Code § 56–19–320 because Nissan failed to property perfect their interest pursuant to S.C.Code § 56–19–630. If so, Nissan would be treated as an unsecured creditor in Debtor's bankruptcy case. In order to perfect a security interest in a motor vehicle pursuant to S.C.Code § 56–19–630, the party seeking to perfect a lien must submit an application for a certificate of title containing the name and address of the lienholder and the date of his security agreement and the required fee. *See also* S.C. CODE ANN. 36–9–311(a) and (b) (Law.Co-op.2003) (compliance with Chapter 19 of Title 56 is equivalent to the filing of a financing statement for purposes of perfection). The record indicates that Nissan did not perfect any kind of a security interest in the Vehicle pursuant to § 56–19–630 because it never submitted the requisite application for a certificate of title listing Nissan as a lienholder, and Nissan does not dispute this assertion.[9] S.C.Code § 56–19–620 provides that security interests are invalid against third parties unless property perfected:

> Unless excepted by § 56–19–610, a security interest in a vehicle of a type for which a certificate of title is required is not valid against creditor of the owner or subsequent transferees or lienholders of the vehicle unless perfected as provided in this article. No other recordation

9. While Nissan admits in its Answer that it did not properly perfect a security interest, it contends that it was only attempting to re-serve a security interest for the benefit of a third party lender.

shall be necessary to protect the interest of the lienholder.

Further, § 544 provides certain powers of the Trustee to avoid a transfer or obligation of the debtor that is avoidable by a hypothetical lien creditor. *See* 11 U.S.C. § 544(a)(1) and (2).[10] Accordingly, Nissan's interest in the Vehicle is unperfected, and the Trustee can avoid Nissan's lien and Nissan shall be declared an unsecured creditor.

### III. Turnover

▉ Debtor and the Trustee seek turnover of the Vehicle pursuant to § 542(a). 11 U.S.C. § 542(a) provides as follows:

(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under *section 363* of this title, or that the debtor may exempt under *section 522* of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

Inasmuch as the Vehicle was property the Trustee could sell, pursuant to the provisions of § 363, § 542(a) provides that the Trustee is entitled to turnover of the Vehicle. *See Jennings v. R & R Cars and Trucks (In re Jennings)*, No. 01–02330, Adv. Pro. No. 01–80044, 2001 WL 1806980, at *4 (Bankr.D.S.C. Sept.17, 2001) (creditors have a mandatory duty to return estate property); *McCarthy v. Imported Cars of Maryland, Inc. (In re Johnson)*, 230 B.R. 466, 470 (Bankr.D.D.C.1999) (trustee entitled to amount he could have sold the car had it not been seized in violation of the stay; dealer had not perfected security interest).[11] However, Nissan sold the Vehicle in December 2002. Section 542(a) also provides that the Trustee is entitled to the *value* of property of the estate, thus the Trustee is entitled to the value of the Vehicle.[12]

### IV. Standing of the Trustee and 11 U.S.C. § 362

▉ Debtor and the Trustee have requested actual and punitive damages and attorneys' fees pursuant to § 362(h) from Nissan for violating the automatic stay by repossessing the Vehicle. Section 362(h) allows an "individual" harmed by a willful

---

10. Section 544(a) provides, in relevant part:
(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by-
(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against

the debtor that is returned unsatisfied at such time, whether or not such a creditor exists.

11. The Court has previously found that Debtor was the owner of the Vehicle at the time of the bankruptcy filing, thus the Vehicle was property of the estate within the meaning of § 542.

12. Debtor argues that if the Vehicle was property of the estate, he is thus entitled to exempt the Vehicle. The Court notes that Debtor claimed an exemption on Schedule C, and there has been no objection to Debtor's exemption. Further, inasmuch as the Court is awarding turnover of the value of the Vehicle to the Trustee, the Court need not address Nissan's argument that Debtor lacks standing to pursue turnover.

violation of the automatic stay to collect compensatory damages, including attorneys' fees and, when appropriate, punitive damages. It is undisputed that Debtor has standing to seek damages pursuant to § 362(h).

Nissan contends that the Trustee is not an "individual" entitled to recover damages under § 362(h). There is a split of authority as to whether a trustee is an individual within the meaning of § 362(h) and thus eligible for damages under that section. The leading case in this Circuit interpreting § 362(h) is *Budget Service Company v. Better Homes of Virginia, Inc.*, 804 F.2d 289 (4th Cir.1986), wherein sanctions were awarded to a corporate debtor for violation of .the automatic stay. The Court of Appeals held:

> We hold that the sanctions imposed by the bankruptcy court which were affirmed by the district court were appropriate under § 362(h). We agree with the reasoning of the bankruptcy court in *In re Tel–A–Communications Consultants*, 50 B.R. 250 (Bkrtcy.Conn.1985) that § 362(h) must be read in conjunction with the rest of § 362 and that its sanctions are not limited to the relief of an "individual" in the literal sense. The Bankruptcy Code does not define the word individual. We agree that it seems unlikely that Congress meant to give a remedy only to individual debtors against those who willfully violate the automatic stay provisions of the Code as opposed to debtors which are corporations or other like entities. Such a narrow construction of the term would defeat much of the purpose of the section, and we construe the word "individual" to include a corporate debtor.

804 F.2d at 292. The Court of Appeals has determined that the definition of the word "individual" in § 362(h) must be viewed in the context of the purpose of the section. *Id.* (construing § 362(h) narrowly would defeat purpose of the statute). Other courts have awarded damages to trustees and/or noted that trustees are entitled to recover pursuant to § 362(h). *See, e.g., Johnson*, 230 B.R. at 470–71; *In re Medlin*, 201 B.R. 188, 194 (Bankr.E.D.Tenn. 1996); *Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods, Inc.)*, 186 B.R. 414, 439 (N.D.Ill.1995); *In re Fugazy Exp., Inc.*, 124 B.R. 426, 431 (S.D.N.Y.1991).

Nissan relies upon a holding by the Ninth Circuit Court of Appeals which held that a trustee is ineligible to receive damages under the private cause of action created by § 362(h) because a trustee is not an "individual." *In re Pace*, 67 F.3d 187, 192 (9th Cir.1995). *Accord In re Bequette*, 184 B.R. 327, 335 (Bankr.S.D.Ill. 1995). However, the Fourth Circuit's arguably broad interpretation of the meaning of the statute lends support for an award of attorney's fees and costs to the Trustee pursuant to § 362(h). The Court further notes that the Ninth Circuit in *Pace*, as well as other courts, have recognized that a trustee can recover damages in the form of costs and attorney's fees under § 105(a) as a sanction for ordinary civil contempt. *Id.* at 193. *See also In re Dyer*, 322 F.3d 1178, 1189–1193 (9th Cir. 2003) (although trustee was not an "individual," trustee may be entitled to damages as sanction for creditor's contempt in violating stay); *Henkel v. Lickman (In re Lickman)*, 297 B.R. 162, 194–95 (Bankr. M.D.Fla.2003) (trustees are awarded damages and attorney's fees under § 105 for violation of automatic stay; question of whether trustee is "individual" only relevant when court considers award of punitive damages). Under these authorities the Court finds that both Debtor and Trustee may recover damages utilizing § 362(h) and/or § 105. Accordingly, the Court will consider whether a willful viola-

tion of the automatic stay (§ 362(h) refers only to *willful* violations) occurred entitling Debtor or the Trustee to damages.

## V. Willful Violation of 11 U.S.C. § 362

 In *Budget Service Company,* the Court of Appeals for the Fourth Circuit defined a willful violation of the automatic stay as occurring when a creditor knows of the pending bankruptcy petition and intentionally attempts to continue collection procedures in spite of it. 804 F.2d at 292–93. There is no dispute in the current case that Nissan had notice of the bankruptcy. It received notice by mail from the Clerk of Court and notice to its attorney from the Trustee. Despite notice, Nissan refused to return the Vehicle to the Trustee, and sold the Vehicle. Continued retention of collateral that was wrongly repossessed post-petition may constitute a willful violation of the automatic stay when the creditor has notice of the pending bankruptcy case. *See, e.g., Bolen v. Mercedes-Benz (In re Bolen),* 295 B.R. 803, 808–09 (Bankr.D.S.C.2002) (citing cases).[13]

## VI. Damages and Conclusion

 Subsequent to the trial held in this matter, the parties stipulated to the value of the Vehicle in the amount of $19,000. Further, the Trustee and Debtor submitted affidavits of their attorneys' fees to which no objection to the amount requested was filed.[14] The Court notes that con-

sidering the facts of this case, including the fact that Debtor had use of the Vehicle for four (4) months without payment, the Court declines to award damages other than attorneys' fees and costs to Debtor pursuant to § 362(h) in the submitted amount of $3,144.99 and lost wages in the amount of $288 and to Trustee in the reduced amount of $12,907.50 pursuant to § 105 and/or § 362(h). Further, for the reasons stated herein, and based upon the parties' stipulation regarding the value of the Vehicle, the Trustee is entitled to turnover from Nissan of the value of the Vehicle in the amount of $19,000 pursuant to § 542(a). Finally, pursuant to the Trustee's avoiding powers under § 544(a), Nissan shall be treated as an unsecured creditor in Debtor's bankruptcy case.

**AND IT IS SO ORDERED.**

---

13. Nissan concedes that a violation of the automatic stay occurred by its repossession of the Vehicle, but contends that the violation as merely technical due to Debtor's limited possessory interest and therefore would not warrant damages.

14. By letter dated December 16, 2003, the Court directed the parties to file affidavits concerning their respective fees and costs. Counsel had until 12:00 noon on December 22, 2003, to object to the amount of fees and

costs requested. This deadline was further affirmed by a responsive letter received by the Court on December 19, 2003, from the Trustee indicating that he agreed to reduce his fees to $12,907.50 and that counsel for Nissan would notify the Court by 12:00 noon on December 22, 2003 if he objected to the reduced amount. No objection was filed and the Court was never notified of any dispute concerning the requested amounts.